GULF, C. & S. F. RY. CO. v. THOMAS et al.

(Court of Civil Appeals of Texas. Austin. May 3, 1911. Rehearing Denied June 7, 1911.)

1. CARRIERS (§ 228*) — CARRIAGE OF LIVE STOCK—EVIDENCE—SUFFICIENCY.

In an action against a railroad company for delay in the shipment of cattle, plaintiff's evidence as to the injury to the cattle held unworthy of belief, and not to support a finding in his favor.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 228.*]

2. APPEAL AND ERROR (§ 1003*)—REVIEW—FINDINGS—EVIDENCE.

The appellate court will resolve all reasonable doubts in favor of a verdict; but when testimony in support of a verdict is so unreasonable as to stagger credulity the appellate court will review it.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3938–3943; Dec. Dig. § 1003.*]

Appeal from Llano County Court; A. H. Wilbern, Judge.

Action by J. I. Thomas against the Gulf, Colorado & Santa Fé Railway Company and the Houston & Texas Central Railroad Company. From a judgment in favor of the Houston & Texas Central Railroad Company and for plaintiff against the first-named defendant, the latter defendant appeals. Affirmed as to the Houston & Texas Central Railroad Company, and reversed and remanded as to the other defendant.

S. R. Fisher, S. W. Fisher, and Terry, Cavin & Mills, for appellant. J. H. McLean, for appellees.

KEY, C. J. Appellee brought this suit against appellant and the Houston & Texas Central Railroad Company, seeking to recover $230 and interest, alleged damages to a shipment of a car of beef cattle made by the plaintiff from Llano to Ft. Worth, Tex. The plaintiff charged the defendants with negligent handling and delay in transportation of the shipment and the consequent failure of the cattle shipped to bring their reasonable value when sold on the market at Ft. Worth. The defendants pleaded a general denial and shipment under a contract limiting the liability of each defendant to its own line, etc.

There was a jury trial, which resulted in a verdict and judgment in favor of the Houston & Texas Central Railroad Company, and in favor of the plaintiff, against the Gulf, Colorado & Santa Fé Railway Company for $224.60 and $34.78 as interest, making the aggregate amount $259.38, with interest thereon from date of judgment at the rate of 6 per cent. per annum, and the latter company has appealed.

We sustain appellant's assignments which complain of the court's charge upon the point that it assumed that appellant was the delivering carrier. There was testimony tending to show that appellant received the shipment from the initial carrier, the Houston & Texas Central Railroad Company, at Lampasas, and carried it from there to North Ft. Worth, where it delivered it to the Ft. Worth Belt Railway Company, and that the latter company delivered it to the consignees. If such was the fact, and the Ft. Worth Belt Railway Company was not owned or controlled by or the agent of appellant, then there

would be no presumption of law that appellant inflicted any of the injuries complained of.

[1] We also sustain the assignment which charges that the verdict is excessive. The shipment consisted of 24 cows, 14 calves, and 1 bull. They were sold on the Ft. Worth market on December 9, 1907, for $278.95; the expense account, including freight charges and commissions, amounted to $71.80, which left $207.15 as net proceeds. The testimony bearing upon injury to the cattle and the amount of damage was given by the plaintiff and his witness R. P. Barse. The plaintiff testified as follows:

"My name is J. I. Thomas. I am the plaintiff in this suit, and am the legal owner and holder of the claim for damages sued for, and no part thereof has ever been paid to me. I am a cattleman, and have been engaged in that business all my life. I have had eight years experience in shipping cattle from Llano, Tex., to Ft. Worth, Tex., for sale there upon the market. I have always shipped over the Houston & Texas Central Railroad Company from Llano to Lampasas, and from thence to Ft. Worth over the Gulf, Colorado & Santa Fé Railway Company, since the railroad was built from Burnet to Lampasas, making the connection that way, which has been some five or six years, I think. Since that line has been open, I have never shipped any other way. I have made several shipments every year in one, two, and three car load lots, and have nearly always accompanied the shipments myself. I have closely observed the effect rough handling and delay in transportation has upon cattle, and the resultant effect to their values when placed upon the market for sale. It is very injurious to cattle to be roughly handled or delayed in transportation. Such treatment causes excessive shrinkage in weight, and renders them stale in appearance, and causes them to class lower, and to bring a lower price than they otherwise would.

"About December 7, 1907, I was the owner of 24 head of cows, 1 bull, and 14 calves, all full fat and in good condition for market, and on that day shipped them from Llano to Ft. Worth over the railroads of the defendants, consigned to Geo. R. Barse Live Stock Commission Company. No one went with this shipment; I simply sent the stock through, consigned as above stated. No one representing me accompanied the cattle. I know the usual and ordinary time consumed in making such a shipment from Llano to Ft. Worth over the lines of the defendants the way these cattle went. If we leave Llano any time in the forenoon, up to about 12 o'clock, we get to Ft. Worth next morning in time to go on the early morning market, usually about 7 or 8 o'clock. I have gotten there by daylight on the following morning, and a few times have gotten there as late as 9 or 10 o'clock, and on one occasion got there as late as 11 o'clock in the morning of the day following shipment from Llano. In

these local shipments, it makes no difference what time we leave Llano in the forenoon; we always get to Lampasas about 5 o'clock of the same day.

"As stated before, I have had considerable experience in shipping cattle from Llano to Ft. Worth for sale on the market, and know pretty well what they will shrink in excess of the shrinkage ordinarily incident to transportation, when confined in the cars longer than they should be, and also what effect such treatment has upon their appearance and sale when placed upon the market. In my judgment, grown cattle, such as mine were, if confined in the cars, say from one morning about 8 o'clock until midnight following, would sustain an excessive shrinkage of 50 pounds per head, over and above what they would have shrunk had they been unloaded at said hour of 8 o'clock, and that calves, such as mine were, under such conditions, would excessively shrink from 10 to 15 pounds per head. I will also state from my experience and close observation in these matters that such treatment—that is, being confined in the car from 8 o'clock one morning until midnight following longer than they should have been—would lessen the value of such cattle to the extent of one cent per pound by reason of their stale appearance and lower classification such treatment occasions. This applies to the grown cattle, as well as to the calves. Cattle upon the market sell according to how they look, and if they look bad they class lower and bring a lower price."

R. P. Barse testified as follows: "My name is R. P. Barse, am 43 years old, reside in Ft. Worth, Tarrant county, Tex., and my occupation is that of cattle salesman for the Geo. R. Barse Live Stock Commission Company. I have been in this business for the past 20 years. On the 9th of December, 1907, I was employed in the same capacity by the same firm as at present. At that time I had been in the business about 18 years. I have had a great deal of experience handling cattle from the Llano country, having sold a great many on the market here, especially during the past seven years that I have been located here. I sold the cattle shipped by J. I. Thomas on or about December 7, 1907, from Llano, Tex., consigned to Geo. R. Barse Live Stock Commission Company, at Ft. Worth, Tex., consisting of 24 cows, 1 bull, and 14 calves. Delivery of said cattle to the Geo. R. Barse Live Stock Commission Company was made by the Santa Fé Railway. As shown by the attached unloading certificate, marked 'Exhibit A,' these cattle arrived at 12:25 a. m., December 9, 1907. At the time of delivery, the cattle were not in very good condition. Several of them were scratched up, and there were two crip cows on them. It depreciated the value of cows fully 25 cents per hundred pounds. I know what the market value of said cattle was at Ft. Worth at the time, and in the condition

they were delivered there. The market value was what the cattle sold for, as shown on copy of account sales attached hereto, marked 'Exhibit B.' The cattle sold by weight, and sold for their full market value in the condition they were in. These cattle weighed and sold as follows:

22 cows weighed 13,110 lbs. and brought $1.55 per cwt.
1 bull     "      1,000  "    "        "    1.50   "   "
2 crip cows                            "    1.50 per head
14 calves   "      2,310  "    "   .    "    2.50 per cwt.

"The effect upon cattle shipped by rail to be delayed in transportation and confined in the cars without feed or water from 15 to 20 hours longer than necessary would be to cause a shrink of 25 pounds per head on the grown cattle, and 10 pounds per head on the calves, and would depreciate the grown cattle 25 cents per cwt. and the calves $1 per hundred pounds. If said cattle had been delivered there from 15 to 20 hours earlier than they were, and had been confined in the cars that much shorter period of time, the grown cattle would have weighed 25 pounds more per head, and the calves 10 pounds more per head. If said cattle had been delivered there from 15 to 20 hours earlier than they were, and had been confined in the cars that much shorter period of time, by reason of their better appearance and higher classification, their market value would have been 25 cents per hundred pounds more on the grown cattle and $1 per hundred on the calves.

"Cross-examination: I do not know what condition these cattle were in at the time they were delivered on the cars at Llano. It is a fact that it is impossible to ship cattle without a certain amount of shrinkage and incidental loss. I have attached to my answers copies of account sales, but haven't copies of the Ft. Worth Live Stock Reporter of the day preceding and of the day upon which the cattle were sold, and therefore cannot attach same."

It was also shown that the shipment left Llano at 8:30 a. m. on December 7, 1907, and was delivered to appellant at 4:55 p. m. the same day. The testimony given by the plaintiff's witness Barse will not support a verdict for more than $100, with interest from December 9, 1907. The plaintiff's evidence, if entitled to credence, will support the verdict.

[2] It is the policy of this court to resolve all reasonable doubts in support of a verdict. But when the testimony relied on for that purpose is so unreasonable as to stagger credulity, and this court is called upon to review it, we feel it to be our duty to set aside such verdict; and, as this case falls within that class, we shall discharge that duty by pursuing that course. In doing this, we deem it proper to analyze the plaintiff's testimony and point out wherein it is believed to be unreasonable, and therefore not the proper basis for this verdict. After having qualified as an expert, he gave it as his opinion that, if there was a delay of about 16 hours in

transporting the cattle from Llano to Ft. Worth, that delay would cause a shrinkage of 50 pounds per head of the grown cattle, and from 10 to 15 pounds per head of the calves, and would also result in a decrease in their market value to the extent of one cent per pound. Now let us keep in mind the fact that this opinion as to deterioration in both weight and value was based solely on the fact of 16 hours delay. It did not embrace failure to feed and water, or any other factor, except keeping the cattle in the car for 16 hours. If that statement was correct, the grown cattle lost weight at the rate of 3⅛ pounds per hour. Now suppose the shipment had been from Llano to Chicago, instead of to Ft. Worth, and there had been no unnecessary delay nor failure to feed and water, and allowing only 60 hours from Ft. Worth to Chicago, if the same ratio in loss in weight had kept up, each grown animal would have lost 187½ pounds while being transported from Ft. Worth to Chicago; and if we assume that the loss in weight began as soon as the animals were put in the car at Llano, and that it continued at the same rate, then there would have been a decrease in weight of about 250 pounds in each animal while being transported from Llano to Chicago. According to that theory, if the shipment had been from Llano to Chicago, and the same ratio of decrease in weight had continued throughout, the cows would have decreased at least one-third in weight without any unnecessary delay in transportation or failure to feed and water. But if it be granted that there would not be as much diminution in weight for the first 20 hours as would result thereafter, still, if that diminution amounted to 3⅛ pounds an hour, as estimated by the plaintiff, it would total 187½ pounds for each cow while being transported from Ft. Worth to Chicago, allowing 60 hours as a reasonable time to make the run between those points. When the animals were sold in Ft. Worth, the 22 cows averaged about 600 pounds, and the calves about 165 pounds, each, and the amount which the plaintiff estimated as their diminution in weight resulting from remaining in the car 16 hours was at least 7 per cent. of their weight.

But the opinion which the plaintiff laid before the jury as to their decrease in weight, resultant from remaining in the car 16 hours, was not the most extraordinary and astounding testimony given by him. He expressed the opinion that the delay referred to would so affect the appearance of the animals as to reduce their market value one cent per pound. That opinion was not based upon any change in the market at Ft. Worth, but solely upon the difference in the appearance of the animals at the time they were placed upon the market, and what would have been their appearance if there had been no unnecessary delay, and they had been placed on the market 16 hours sooner. Now, if the plaintiff was correct in that estimate, and

the shipment had not stopped at Ft. Worth, but gone on to Chicago in 60 hours time, and the same ratio of decrease in market value had continued, by the time the animals reached Chicago, they would have declined in value 3¾ cents per pound; and if they had been shipped from Llano to Chicago, allowing 80 hours to make the run, the total decline in value would have been 5 cents per pound.

Thus it would seem that, if the plaintiff's estimate of the amount of decrease in market value of the animals is correct and applicable to the entire time of a given shipment, then if he had shipped them to Chicago, instead of Ft. Worth, though properly fed, watered, and handled, they would have lost in market value as much or more than Texas cattle were probably selling for in Chicago at that time, *and therefore would have been worth nothing when they reached that market.* It was not shown and is not contended that the decrease in either weight or market value is greater in ratio at one period of a shipment than at another; but, if such is the case, that difference cannot be such as to justify the extravagant and unreasonable opinions and estimates testified to by the plaintiff in this case. Taking the 22 cows that were sold by weight for the purpose of illustration, and we find him giving it as his opinion that, *on account of 16 hours delay,* and for no other reason, each cow depreciated nearly 8 per cent. in weight and more than one-third in pound value. *These two estimates combined amount to nearly one-half the value of each animal.* This sufficiently illustrates the unreasonableness, if not the absurdity, of the testimony which appellee is compelled to rely on in support of the verdict which he obtained; and, however honest he may have been in expressing the opinions referred to, we feel compelled to hold that they are so unreasonable that they cannot, in right and justice, be held to show that he has sustained the amount of damage awarded him by the verdict.

As between appellee Thomas and the Houston & Texas Central Railroad Company, the judgment is affirmed; as between him and the appellant the Gulf, Colorado & Santa Fé Railway Company, the judgment is reversed, and the cause remanded for another trial.

Affirmed in part, and in part reversed and remanded.